UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| KHODAYAR AMIN on Behalf of Himself and All Others Similarly Situated, | X : | Case No. |
| Plaintiff, | : : : | **12 CV 4403** |
| v. | : : | CLASS ACTION COMPLAINT |
| THE NASDAQ STOCK MARKET LLC, and NASDAQ OMX GROUP, INC., | : : : | |
| Defendants. | : : | |
| | X | JURY TRIAL DEMANDED |

**INTRODUCTION**

1.      This is a federal class action brought by plaintiff on behalf of all individuals or entities seeking to purchase shares of Facebook, Inc. ("Facebook") during its initial public offering ("IPO") on May 18, 2012, whose purchase and/or cancellation orders were not promptly and accurately processed, were delayed, or otherwise were adversely affected by the events described herein, and who suffered monetary losses thereby.

2.      Facebook's IPO was the most highly anticipated IPO in recent memory. After a highly contested battle with the New York Stock Exchange, on April 5, 2012, news organizations began to report that Facebook would list with the NASDAQ Stock Market. This was considered a major coup for NASDAQ (as defined herein), as an IPO of this size brought not only increased revenues and earnings, but a huge boost to NASDAQ's reputation.

3.      Unfortunately, the defendants grossly mishandled Facebook's IPO. Initially, the defendants delayed the opening of trading in Facebook for nearly thirty minutes. According to reports, up to two minutes before the opening, NASDAQ was still attempting to work through orders and cancellations. After the opening, matters became much worse. The massive amount of trading in Facebook stock overwhelmed NASDAQ's trading system causing a backlog of

unfilled orders. Confirmations of orders, which normally arrive in seconds, were not being sent timely from NASDAQ. Investors and brokers could not tell whether their orders went through and if they did, at what price. Hours passed before NASDAQ processed some trade orders, leaving investors unable to figure if and when they should sell their stock, or even if they owned stock. In addition, NASDAQ was so overwhelmed that it failed to cancel other orders despite timely customer requests to do so.

4.      Plaintiff is one such investor that timely sought to cancel his purchase of Facebook stock, but NASDAQ failed to process his cancellation. This damaged plaintiff and other Class (as defined herein) members because Facebook's price had declined in value, meaning they were forced to acquire stock at an almost immediate loss. Other class members were unable to determine if their buy orders had been executed, which meant they could not tell if and when they should sell their stock.

5.      By this action, plaintiff seeks recovery for himself and for Class members for damages suffered because of NASDAQ's gross negligence.

## PARTIES

6.      Plaintiff Khodayar Amin on May 18, 2012, placed purchase and cancellation orders for Facebook's stock that NASDAQ failed to promptly and accurately execute. Plaintiff suffered losses thereby.

7.      Defendant NASDAQ Stock Market LLC ("NASDAQ LLC") is a Delaware limited liability company with its principal place of business at One Liberty Plaza, New York, New York.

8.      Defendant The NASDAQ OMX Group, Inc. ("NASDAQ OMX") delivers trading, clearing, exchange technology, regulatory, securities listing, and public company services worldwide. It offers trading across various asset classes, including cash equities,

derivatives, debt, commodities, structured products, and exchange traded funds; market data products, financial indexes, capital formation solutions, financial services, and market technology products and services, as well as clearing, settlement, and depository services. NASDAQ OMX also provides trade reporting, trade comparison, and risk management services; broker services comprising technology and customized securities administration solutions to financial participants. In addition, it offers global listing services; technology solutions for trading, clearing, settlement, and information dissemination; and facility management integration, surveillance solutions, and advisory services, as well as develops and licenses NASDAQ OMX branded indexes, associated derivatives, and financial products. As of December 31, 2011, the company had approximately 3,500 listed securities on the NASDAQ. It offers approximately 2,600 indexes. NASDAQ OMX offers technology solutions to approximately seventy exchanges, clearing organizations, and central securities depositories in approximately fifty countries. NASDAQ OMX was formerly known as The Nasdaq Stock Market, Inc. and changed its name in February 2008. It is a Delaware corporation with its principal place of business at One Liberty Plaza, New York, New York. NASDAQ OMX, together with NASDAQ LLC, operates the NASDAQ Stock Market, and are collectively named herein as "NASDAQ."

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter presented by this class action complaint because it is a class action arising under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No.1 09-2, 119 Stat. 4 (2005), which explicitly provides for the original jurisdiction of the Federal courts over any class action in which any member of the plaintiff class is a citizen of a state different from any defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5 million, exclusive of interest and costs. Plaintiff alleges

that the total claims of the individual members of the Class in this action are in excess of $5 million in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. §1332(d)(2), (5).

10.     Plaintiff is a citizen of Florida and defendants can be considered citizens of New York and Delaware for purposes of diversity. Therefore, diversity of citizenship exists under CAFA as required by 28 U.S.C. §1332(d)(2)(A). Furthermore, plaintiff alleges members of the proposed Class in the aggregate are citizens of a state other than New York, where this action is originally being filed, and that the total number of members of the proposed Class is greater than 100, pursuant to 28 U.S.C. §1332(d)(5)(B).

11.     Jurisdiction is also conferred by 28 U.S.C. §1332. There is complete diversity among the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

12.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because defendants' principal place of business was located in this district at all times relevant to this action, and many of the acts charged herein occurred in this district.

13.     Non-party Facebook operates as a social networking company worldwide. Facebook builds tools that enable users to connect, share, discover, and communicate with each other; enables developers to build social applications on Facebook or to integrate their websites with Facebook; and offers products that enable advertisers and marketers to engage with its users. As of February 2, 2012, it had 845 million monthly users and 443 million daily users. Facebook was founded in 2004 and is headquartered in Menlo Park, California. It went public in the IPO on May 18, 2012.

## SUBSTANTIVE ALLEGATIONS

14.     On May 18, 2012, Facebook began public trading on the NASDAQ. Trading began at the IPO price of $38 a share, which valued the company at approximately $104 billion.

15.     Facebook's stock was initially supposed to start trading at 11:00 a.m., Eastern Standard Time. At 10:58 a.m., however, NASDAQ issued a notice stating that trading would be delayed until 11:05 a.m. Facebook, however, did not start trading at this time. Over twenty minutes later, at 11:28 a.m., NASDAQ announced that trading in Facebook's stock would begin at 11:30 a.m. The delay was caused by technical problems that delayed NASDAQ from timely processing purchase and cancellation orders. According to news reports, orders that were supposed to be processed in three milliseconds were taking five milliseconds. This proved to be a major problem. During the extra two milliseconds, new orders flooded in, thwarting the system's ability to establish an opening price for the stock and leading to a backup in unprocessed orders. Once trading started in Facebook's stock, the problems only got worse.

16.     On May 25, 2012, *Reuters* published an article giving minute by minute detail of Facebook's IPO fiasco. The article explained the confusion and inability to timely process orders that occurred in the IPO. In particular, it stated:

> Nasdaq CEO Bob Greifeld pumped his fist at the symbolic opening bell ceremony at Facebook's headquarters in Menlo Park, California next to Facebook CEO Mark Zuckerberg an hour-and-a-half before the company's stock was due to start trading. There were no outward signs then of the problems that were about to unfold back on Wall Street.
>
> At 10:58 a.m., Nasdaq issued a notice that the Facebook opening would be delayed until 11:05 a.m. IPO delays of that nature are not unusual, especially with a massive launch like Facebook.
>
> But then the revised start time passed without an opening trade on the stock. Minutes passed as traders waited. Nasdaq's next communication came at 11:13 a.m., when it noted in a terse emailed message to people who subscribe to the exchange's alerts that Nasdaq is "experiencing a delay in delivering the opening print in Facebook," with no other details.

Meanwhile, market-makers were receiving messages about their orders that later proved to be inaccurate. They say they were told during the period between 11:05 and 11:30 a.m., when the stock finally opened, that orders were still being taken for the opening price.

"Nasdaq representatives were stating right up until 11:29 that they were still accepting orders in Facebook for the open," said Turner of Instinet.

But that wasn't the case. Later, Turner said he was told that orders submitted up to 25 minutes before the opening were either canceled or not submitted into the marketplace until about 1:50 p.m. - more than two hours later. Other market makers received similar messages.

Behind the scenes, the massive order volume was overwhelming Nasdaq's systems.

Orders that were supposed to be processed in 3 milliseconds were taking 5 milliseconds, said one person familiar with exchange operations. This proved to be a major problem: In the extra two milliseconds new orders flooded in, thwarting the system's ability to establish an opening price for the stock and leading to a backup in unprocessed orders.

"This is starting to get bizarre," Wayne Kaufman, an equity market strategist at brokerage John Thomas Financial, said from the firm's trading floor on Wall Street, around 11:15 a.m.

Finally, the decision was made to put through a fix to the systems problem and get the stock trading. That move to a secondary matching engine used the order book as it appeared at 11:11 a.m. - but this meant new orders and changes in orders that came in later did not show up in the opening price. A matching engine is a computer that pairs bids and offers to complete trades.

Eric Noll, Nasdaq's head of transaction services, said in a statement earlier this week that the fix instead led to 2-1/2 hours of uncertainty during which brokers were unable to see the results of their trades.

TRADING HALT?

The stock opened at 11:30:09 a.m. at $42.05 a share. An investor looking at a quote screen might have thought the trouble had ended there. In reality, the problems were about to worsen.

After initially heading to a high of $45, the stock soon began to plunge towards its issue price at $38. Lead underwriter Morgan Stanley stepped in to defend the stock while some others - unsure whether their orders had been processed or not - backed away from trading or decided to sell.

If confidence is undermined at the open, people "pull back because their orders are essentially going into a black hole," said former Nasdaq Vice Chairman David Weild.

Clients were telling their brokers they had not received confirmation of orders - which normally come through in seconds.

"Multiple market makers called Nasdaq and asked them to halt the stock and said, 'You have a problem and it's getting worse,' and their response was, 'The stock is trading normally,'" said an executive at one market-maker.

It is unclear who would have the authority to halt the stock. Nasdaq would not comment on whether it considered such a move.

For market-makers, the chaos was particularly problematic because they didn't know what they and their clients owned, and at what price.

"Should I be selling stock, should I be buying? And what's my price point?" said another official at a market-making firm. "You just don't know, so you were in effect flying blind until 2 o'clock."

17.    A May 18, 2012 *The Wall Street Journal* article, described a typical investor experience:

Eric Hamrick was eager to get his hands on newly minted Facebook Inc. stock, placing an order for 500 shares at 6 a.m. Friday before the company's debut on the Nasdaq Stock Market.

The order to buy shares for as much as $49 apiece never made it through. By 11:30 a.m., after the opening of the stock was delayed by a half hour, Mr. Hamrick got nervous and tried to cancel his order. But his online brokerage, Scottrade, displayed the cancellation as "pending," leaving him wondering whether he had bought shares or had stayed out of trading.

* * *

At 4 p.m., his Scottrade account showed the order expired.

18.    Unlike Mr. Hamrick, however, legions of investors ended up purchasing Facebook stock, even though they canceled the order. Other investors were unaware if they had actually purchased stock, and therefore, did not know what steps they should take to minimize their losses.

19.     NASDAQ acknowledged it was at fault.  A different May 21, 2012 *Reuters* article, stated that "Nasdaq Chief Executive Robert Greifeld said in a conference call with reporters on Sunday that there had been a malfunction in the trading system's design for processing order cancellations."

20.     On the morning of the IPO, plaintiff attempted to purchase Facebook stock through Vanguard brokerage service.  Plaintiff placed a purchase limit order for 1,000 shares of Facebook stock at $38.  When those trades failed to execute, plaintiff sought to cancel them. Rather than canceling the trades, plaintiff's account simply listed the cancellations as "pending." This persisted throughout the day.  At the close of the day on May 18, 2012, plaintiff's account still listed the cancel order as pending.

21.     On Monday, May 21, 2012, plaintiff was shocked to learn that the purchase of Facebook stock went through at $38 per share.  Plaintiff contacted his broker and was told that they were not notified of the purchase order until 4:10 p.m., ten minutes after the close of trading.

22.     Because plaintiff was unable to determine what shares, if any, of Facebook he held, he was unable to trade in accordance with a rational trading strategy.  Further, Facebook's stock has continued to fall, and is currently trading at under $28 per share.

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this class action under rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of the following Class:

> All individuals or entities who placed buy, sell, or cancellation orders with respect to Facebook stock on the NASDAQ on May 18, 2012, whose orders were not promptly, timely, and correctly processed, and were therefore adversely affected by the events described herein, and who suffered monetary losses thereby.

24.     The Class is so numerous that joinder of all Class members is impracticable. Billions of dollars worth of Facebook's shares were traded on May 18, 2012.  Based upon information and belief, thousands of Class members were affected by NASDAQ's negligence.

25.     There are questions of law and fact common to members of the Class that predominate over any questions affecting individual members, which include:

(a)     Whether the problems publicly reported in the days following Facebook's debut on the NASDAQ affected members of the Class;

(b)     Whether defendants had a duty to ensure plaintiff and the Class' trades in Facebook stock were processed promptly and effectively;

(c)     Whether defendants were negligent in failing to take the steps necessary to ensure plaintiff and the Class' trades in Facebook stock were processed promptly and effectively; and

(d)     Whether, as a result of defendants misconduct, plaintiff and the Class are entitled to relief, and the amount and nature of such relief.

26.     Plaintiff's claims are typical of the claims of the Class.  Plaintiff has no interests antagonistic to those of the Class, and defendants have no defenses unique to plaintiff.

27.     Plaintiff will fairly and adequately assert and protect the interests of the Class, and has retained attorneys experienced in class and complex litigation.

28.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy for the following reasons:

(a)     The Class is readily definable;

(b)     It is economically impracticable for members of the Class to prosecute individual actions, because the amount which may be recovered by each individual Class member would be insufficient to support separate actions;

(c)     The aggregate amount which may be recovered by individual Class members will be large enough in relation to the expense and effort in administering the action to justify a class action;

(d)     Plaintiff is seeking relief with respect to the Class as a whole; and

(e)     Prosecution as a class action will eliminate the possibility of repetitious and possibly contradictory litigation.

29.     A class action will cause an orderly and expeditious administration of the claims of the Class. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

30.     This class action presents no difficulties in management that would preclude maintenance as a class action. The Class is readily definable and is one for which records of the names and addresses of the members of the Class exist in the files of defendants or third parties.

## COUNT I

### (Negligence)

31.     Plaintiff hereby incorporates each of the preceding and subsequent paragraphs as if fully set forth herein.

32.     Defendants owed plaintiff and the Class the duty of reasonable care, which they breached. In addition, as a stock exchange, defendant NASDAQ LLC and defendant NASDAQ OMX owed plaintiff and the class a duty to exercise reasonable care to execute trade orders promptly, accurately, and efficiently and to maintain an orderly trading market.

33.     Defendants were negligent in performing these duties, rendering them liable and/or strictly liable, for the following reasons:

(a)     Failing to ensure plaintiff's and the Class' trade orders in Facebook stock were timely and effectively executed;

- 10 -

(b)     Failing to implement effective quality control procedures regarding plaintiff and the Class' transactions in Facebook stock;

(c)     Failing to oversee the employees or independent contractors who had the responsibility to ensure that plaintiff and the Class' transactions in Facebook stock were timely and effectively executed; and

(d)     Any and all other acts of negligence, recklessness, and omissions to be proven through discovery or at the time of trial of this matter, all of which are in contravention of the duties imposed on defendants in favor of plaintiff and Class members.

34.     As a result of defendants' breach of their legal duties, plaintiff and the Class suffered damages as described herein.

35.     The damages suffered by plaintiff and the Class were all general and special damages arising from the natural and foreseeable consequences of defendants' conduct.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of himself and all other individuals similarly situated, prays for judgment as requested above against defendants and further prays for:

A.     An order certifying this case as a class action and appointing plaintiff as the Lead Plaintiff and his counsel as Lead Counsel pursuant to Fed. R. Civ. P. 23(g);

B.     A determination as to defendants' liability for damages;

C.     A determination as to declaratory and injunctive relief;

D.     An award of restitution, rescission, and damages;

E.     An award of pre-judgment and post-judgment interest on all damages as allowed by law;

F.     An award from a common fund created for attorneys' fees and the costs of filing and litigating this suit; and

G.   An award of such other relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all issues so triable.

Dated: June 4, 2012

LAW OFFICES OF THOMAS G. AMON

THOMAS G. AMON

250 West 57th Street, Suite 1316
New York, NY 10107
Telephone: (212) 810-2430
Facsimile: (212) 810-2427

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
GREGORY E. DEL GAIZO
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991

THE WRIGHT LAW OFFICE, P.A.
WILLIAM C. WRIGHT
301 Clematis Street, Suite 3000
West Palm Beach, FL 33401
Telephone: (561) 514-0904
Facsimile: (561) 514-0905

*Counsel for Plaintiff*

737625